IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

REGINA GEORGE                 *

      PLAINTIFF,          *

                      *

v.                        *      Civil No. 1:14-cv-02808-WMN

                      *

MARYLAND DEPARTMENT OF
PUBLIC SAFETY AND       *
CORRECTIONAL SERVICES

                      *

      DEFENDANT        *

    *      *      *      *      *      *      *

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT**

     Plaintiff, Regina George, by and through undersigned counsel, submits this Memorandum in

Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, and in the alternative, Motion for

Summary Judgment.

**INTRODUCTION**

     This is an employment discrimination case brought under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq.*, and Maryland's Fair Employment Practices Act ("FEPA"), MD.

Code Ann., State Gov't § 20-606.  Plaintiff, a State employee, was disabled as a result of an incident that

occurred while at work.  Due to Plaintiff's disability, and at the request of Plaintiff's physician, Plaintiff

was granted reasonable accommodations, which among other things included access to a more

accessible entrance.   During Plaintiff's thirty-fifth year of employment, Defendant alleged that Plaintiff

violated a department work policy.   As punishment for Plaintiff's minor workplace infraction,

Defendant revoked Plaintiff's reasonable accommodation and denied Plaintiff use of the more accessible

entrance.   Additionally, Plaintiff has been subjected to a continuous hostile work environment stemming

from her 1998 injury.   Plaintiff has exhausted administrative remedies in requesting Defendant to

provide a reasonable work environment.   Defendant's unlawful revocation of Plaintiff's reasonable

accommodations as a disciplinary action, forced Plaintiff to petition this court for the proper remedy.

## STATEMENT OF FACTS

Plaintiff began working for the State of Maryland ("the State") in 1978.   Since 1989 she has

continued to be employed by the State as Pretrial Investigator at the Baltimore City Central Booking and

Intake Center ("Central Booking"), an agency within the Department of Public Safety and Correctional

Services ("the Department"), Division of Pretrial Detention Services ("DPDS").   Tragically, on

September 19, 1998, Plaintiff's foot and ankle were crushed due to a malfunction in an elevator at

Central Booking.   Ironically, this is the very elevator that Warden Carolyn Scruggs touts as accessible to

Plaintiff in support of the denial of Plaintiff's request for reasonable accommodations.[1]   After over two

years of painful and grueling rehabilitation, Plaintiff was finally cleared by her physicians to return to

work on September 27, 2000, with the following conditions: duty work under the following

accommodations:

      i.      Access to the institution from the Eager Street entrance to minimize long-distance walking rather than any other entrance to the facility.

---

[1] Paragraph 8 of Affidavit of Carolyn J, Scruggs, Exhibit A to Defendant Memorandum of Law in Support of Defendant's Motion to Dismiss and, in the Alternative, Motion for Summary Judgment.   "Entry through the North Sally Port does not require Ms. George to climb or descend any stair case because it is accessible to an elevator."

    ii.      A work booth in close proximity to the bathroom
    iii.    Flexible scheduling to attend physician visits[2]

Since Plaintiff's 1998 accident, plaintiff has been classified as permanently partially disabled and considered a "qualified individual" with a disability within the meaning of the ADA as she possesses all of the legitimate skill, experience, education, or other requirements of her employment position and and as such, can perform the essential functions of the position with a reasonable accommodation.  On September 24, 2001 Commissioner Lauren A. Spekas, at the Maryland Workers' Compensation Commission ruled that Plaintiff:

> Has a permanent partial disability resulting in 40% loss of use of right foot; 35% is due to this accidental injury and 5% is due to a pre-existing condition; and further has an overall 15% industrial disability to the body due to psychiatric condition, 5% is due to this accidental injury, and 10% is due to a pre-existing condition.[3]

Following the Plaintiff's return to work in the year 2000 until March 2013, Defendant agreed that Plaintiff is an individual who is qualified to perform essential job functions with reasonable accommodations.  At no time since Plaintiff's return to work from her accident in 2000 until March 2013, did Defendant allege that accommodating Plaintiff's physician's request for reasonable accommodations with regard to the use of the Eager Street entrance would impose an undue hardship. Additionally, since Plaintiff returned to work in 2000, with varying intensity but with a severe and pervasive element, Plaintiff has been subject to discriminatory behavior based on her disability.[4]   It was not until March of 2013, when Plaintiff was reprimanded for a level 1 policy violation that Defendant

---

[2] September 14, 2000 letter from Dr. Mark A, Young describing condition in which Plaintiff would be allowed to return to work.
[3] Commissioner Lauren A. Spekas, September 24, 2001 Workers Compensation Commission Order
[4] See Affidavits of Regina George

for the first time since providing her an accommodation that accommodation provided to Plaintiff which previously had been agreed upon by the parties to constitute a "reasonable accommodation" with the meaning of the applicable law for the prior 13 years now magically, an unreasonable request,   At no time have Defendants offered a physician's opinion or other expert testimony or other empirical evidence to substantiate this incredible change in position, that providing access to Plaintiff through the Eager Street entrance  had now become an unreasonable request. to validate the unreasonable claim.

## LEGAL ARGUMENT

I.      **PLAINTIFF'S ADA CLAIM IS NOT BARRED BY THE STATE'S ELEVENTH AMENDMENT IMMUNITY-- IN FACT TITLE II OF THE ADA APPLIES TO ALL STATE AND LOCAL GOVERNMENT ENTITIES, THEIR DEPARTMENTS, AGENCIES, AND ANY OTHER INSTRUMENTALITIES**

The Defendant's assertion that Plaintiff's case is barred by the Eleventh Amendment is untenable as it is not supported by legislative intent or case law.  Title II of the ADA prohibits "public entities" from discriminating against disabled individuals:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C.A. § 12132 (West 1995).  A "public entity" is broadly defined under the statute to be "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C.A. § 12131(1) (West 1995).  Similarly, Section 504 of the Rehabilitation Act prohibits discrimination against disabled individuals "under any program or activity receiving Federal financial assistance," 29 U.S.C.A. § 794(a) (West Supp.1997), and defines "program or activity" to include "all of the operations of ... a department, agency, special purpose

district, or other instrumentality of a State or of a local government." 29 U.S.C.A. § 794(b)(1)(A).[5]  In

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55-58 (1996), the Supreme Court set forth a two-part

test for determining whether an act of Congress abrogates states' Eleventh Amendment immunity: (i)

Congress must unequivocally express its intent to abrogate the immunity; and (ii) Congress must act

pursuant to a valid exercise of power.   42 U.S.C. § 12202, provides that a "State shall not be immune

under the Eleventh Amendment to the Constitution of the United States from an action in [a] Federal or

State court of competent jurisdiction for a violation of the ADA.

Recent Supreme Court precedent has been consistent that Congress may abrogate states'

Eleventh Amendment immunity pursuant to § 5 of the Fourteenth Amendment. See *Florida Prepaid*

*Postsecondary Educ. Expense Bd.*, 119 S. Ct. at 2205; Close v. State of New York, 125 F.3d 31, 38 (2d

Cir. 1997) ("After Seminole, the only source of congressional abrogation stems from the Fourteenth

Amendment."). Section 5 of the Fourteenth Amendment empowers Congress to enact "appropriate

legislation" to "enforce" its substantive provisions, including the Equal Protection Clause. A statute is

"appropriate legislation" to enforce the Equal Protection clause1 if "it is plainly adapted to that end and

it is not prohibited by, but is consistent with the letter and spirit of the Constitution." *Katzenbach v.*

*Morgan*, 384 U.S. 641, 651 (1966).  In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court

explained that the authority to enforce the Fourteenth Amendment is a broad power to remedy

discrimination and prevent future discrimination, see *id*. at 517-18, 536, and that Congress can prohibit

activities that are not themselves unconstitutional in furtherance of its remedial scheme. See *id*. at 518,

529-30. It stressed, however, that Congress's power under § 5 must be linked to constitutional injuries

and there must be a "congruence and proportionality" between the harms to be prevented and the

[5] Amos v. Maryland Dept. of Public Safety and Correctional Services, 126 F.3d 589 (C.A.4 (Md.), 1997)

statutory remedy. Id. at 520. This "proportionality" analysis has been further refined by Florida Prepaid

Postsecondary Education Expense Board: "for Congress to invoke § 5, it must identify conduct

transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme

to remedying or preventing such conduct." 119 S. Ct. at 2207.

      The evil that Congress sought to combat by passing the ADA was irrational discrimination

against persons with disabilities.  See generally 42 U.S.C. § 12101 (1994) (stating, inter alia, "some

43,000,000 Americans have one or more physical or mental disabilities[;] . . . historically, society has

tended to isolate and segregate individuals with disabilities, and . . . discrimination against individuals

with disabilities continue[s] to be a serious and pervasive social problem; . . . discrimination . . . persists

in . . . employment"). Congress's finding in paragraph (a)(7) of § 12101 warrants particular emphasis:

"individuals with disabilities are a discrete and insular minority who have been faced with restrictions

and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of

political powerlessness in our society, based on characteristics that are beyond the control of such

individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of

such individuals to participate in, and contribute to, society . . . ."  Congress spent hundreds of hours in

hearings determining the scope of the problem and the best manner to address it. See Timothy M. Cook,

*The Americans with Disabilities Act: The Move to Integration*, 64 Temp. L. Rev. 393, 393-94 & nn. 1-4

(1991) (reciting deliberative process as including "eleven public hearings in the House of

Representatives and three by the Senate and lengthy floor debates in the Senate and in the House of

Representatives" and collecting citations thereto); see also *Coolbaugh v. Louisiana*, 136 F.3d 430, 436-

37 & n.4 (5th Cir.) (recounting extensive deliberative and fact gathering process), cert. denied,  119 S.

Ct. 58 (1998). Congress considered and rejected the assumption that the "inferior economic and social

status of disabled people . . . [was] an inevitable consequence of the physical and mental limitations imposed by disability," instead attributing the inferior status to "discriminatory policies based on unfounded, outmoded stereotypes and perceptions, and deeply imbedded prejudices toward people with disabilities." H.R. Rep. No. 101-485(III), at 25 (1990), reprinted in 1990 U.S.C.C.A.N. 447-48 (House Judiciary Committee Report).

Congress intended that the ADA "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," to provide "clear, strong, consistent, enforceable standards" to combat such discrimination, and "to ensure that the Federal Government plays a central role in" the enforcement of these standards through the full use of its legislative powers under § 5 of the Fourteenth Amendment and the Commerce Clause. 42 U.S.C. § 12101(b).   It is an established principle of constitutional law that the Equal Protection Clause protects against class- or group- based invidious discrimination. The Equal Protection Clause prohibits "arbitrary and irrational discrimination" even if no suspect class or fundamental right is implicated. *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988); see *Romer v. Evans*, 517 U.S. 620, 631-34 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (invalidating special use permit requirement for placement of home for mentally disabled where apparent rationale was "irrational prejudice"). Moreover, Congress may prohibit conduct that is not itself unconstitutional as prophylaxis against discrimination that may be subtle or difficult to detect. See *City of Boerne*, 521 U.S. at 529-30. In light of Congress's findings of the extent of discrimination against people with disabilities, and with due regard to the deference owed to Congress in making such judgments, the Court will not second-guess Congress's judgment that the ADA was targeted to remedy and prevent irrational discrimination against people with disabilities. See *id*. at 519-20 ("Congress must have wide latitude in determining where [the line between measures that

remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law] lies").  Courts have constantly and consistently held that the ADA is a proportionate and congruent response to the discrimination that Congress sought to prohibit. See *City of Boerne*, 521 U.S. at 520 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.").

The ADA targets particular practices -- in this case, discrimination in employment -- and provides a remedy following the time-tested model provided by the anti-employment discrimination provisions of Title VII of the Civil Rights Act of 1964. See H.R. Rep. No. 101-485(III), at 26 (1990), reprinted in1990 U.S.C.C.A.N. 449 ("The [ADA] completes the circle begun [by the Rehabilitation Act] with respect to persons with disabilities by extending to them the same civil rights protections provided to women and minorities beginning in 1964.") (House Judiciary Committee Report); see also *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51-52 (2d Cir. 1998) (applying McDonnell-Douglas burden shifting analysis to ADA claim).  Courts have been consistent in finding that the anti-discrimination provisions of the ADA provide a narrowly tailored and reasonable response to the problem of discrimination against people with disabilities. Accordingly, Congress's enactment of the ADA was within its authority under § 5 of the Fourteenth Amendment and its abrogation of states' Eleventh Amendment immunity is effective.

## II.     SUMMARY JUDGEMENT IS NOT APPROPRIATE BECAUSE THERE EXISTS A GENUINE DISPUTE AS TO MATERIAL FACTS

Summary judgment is proper and appropriate only if no genuine issue of material fact is in dispute. See Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact is in dispute, "[t]he

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 2513, 91 L.Ed.2d 202 (1986).[6]   In

the case at bar, summary judgment is premature due to the multitude of disputed facts in that exist.  For

example, as part of the reasonable accommodations provided to Plaintiff, MTA Mobility (Plaintiff's

mode of transportation since her 1998 injury) was able to access the Eager Street entrance to drop

Plaintiff off for work.  Following the revocation of Plaintiff's reasonable accommodations, MTA

Mobility was unable to access the Eager Street entrance to drop Plaintiff off for work.   On June 26,

2013, Michael S. Romeo, Operations Manager for MTA Mobility Services, informed Stacey Lyles, of

DPSCS, in writing, that the new mandatory entry for Plaintiff located at "one north" is "inaccessible to

[MTA Mobility] operators and not a safe drop off point for a Mobility vehicle."[7]  Nevertheless, Warden

Scruggs asserted that MTA mobility (Plaintiff's mode of transportation since her 1998 injury) has the

same access to the new mandatory entrance as MVA Mobility had to Eager Street entrance, the entrance

that the Plaintiff previously used prior to be denied reasonable accommodations.(cite to affidavit here)

Also, Defendant DPDS argues in its Memorandum in Support of Motion to Dismiss and, in the

alternative Summary Judgment, "that the accommodation Plaintiff is seeking for her mobility problems

would not result in lesser distance to travel or less impediments".[8]  In her affidavit, Warden Scruggs

states that "…the distance Ms. George must walk from the Eager and Madison entrances are

comparable, if not less through the North Sally Port Entrance.  Ms. George's request for access to the

building through the Eager or Madison Street entrances would not alleviate a hardship or obstacle

---

[6]Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)
[7] June 26, 2013 Michael S. Romeo MTA Letter.
[8] Memorandum of Law In Support of Defendant's Motion to Dis miss and, in the Alternative, Motion for Summary Judgment

presented by entrance through the North Sally Port."[9]  However, Plaintiff, Plaintiff's physicians, and Plaintiff's co-workers assert otherwise.

Defendant argues that Plaintiff's work environment is not hostile because it is isolated and not part of the continuing violation doctrine.  Since 2002, Plaintiff has complained both internally and externally about a hostile work environment.  The severity and frequency of Plaintiff's discriminatory treatment is an issue to be evaluated by a trier of fact, with the aid of discovery.  Even at this stage of litigation prior to having had the opportunity to engage in any discovery, there are numerous material facts in dispute. For example, as part of a reasonable accommodation provided to Plaintiff, MTA Mobility (Plaintiff's mode of transportation since her 1998 injury), is unable to drop off point   Whether the adverse discrimination is pervasive as Plaintiff alleges, or isolated as Defendant alleges, is a question of fact that for the jury to decide.  It has been previously held that summary judgment should rarely be granted in employment discrimination cases. *Johnson v. Department of Soc. & Health Servs.*, 80 Wn. App. 212, 226,  907 P.2d 1223 (1996). To defeat summary judgment, the employee must establish specific and material facts to support each element of her prima facie case *Marquis v. Spokane* 105 130 Wn.2d 97, 922 P.2d 43  (1996); *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998) [10] In the case at bar, the affidavits of Plaintiff and her co-workers support and establish specific material facts to support Plaintiff's claims.  Rule 56(f)6 provides for the denial of a summary judgment motion in situations where the nonmoving party has not had an opportunity to make full discovery.  For all the stated reason above summary judgment is not appropriate due to the many disputes of material facts that are present in this case.

---

[9] Carolyn Scruggs Affidavit
[10] *Bauer v. National Data Funding Corp.*,. (Wash.App. Div. 2, 1999)

III.   **THE ACCOMODATION REQUESTED AND ORIGINALLY GRANTED TO PLAINTIFF IS REASONABLE AND DOES NOT IMPOSE AN UNDUE HARDSHIP ON DEFENDANT**

The ADA employment provisions define discrimination as, among other things, "not making reasonable accommodations" for a disabled applicant or employee if those accommodations would not "impose an undue hardship on the operation of the business" of the employer. 42 U.S.C. § 12112(b)(5)(A); see also 42 U.S.C. § 12112(b)(5)(B) (addressing the denial of employment opportunities to a qualified disabled individual based on the necessity for making a reasonable accommodation). The employer need not make an accommodation if the steps to be taken would "requir[e] significant difficulty or expense," considered in the light of several factors, including the cost of the accommodation and the size and resources of the employer. 42 U.S.C. § 12111(10). As the Fourth Circuit explained in *Coolbaugh*, Congress heard testimony that businesses would benefit from the improved labor pool that would result from making accommodations for the disabilities of potential employees. See 136 F.3d at 437-38 (citing testimony). Therefore, Congress enacted a proportional and congruent remedy in requiring employers to make those accommodations that did not impose significant difficulty or expense.  A reasonable accommodation would permit the employee to perform the essential functions of the employee's position, the employee has a "disability" within the meaning of the statute, and the employer cannot disadvantage the employee based on that disability (see *Romanello v Intesa Sanpaolo S.p.A*, 22 NY3d 881, 885 [2013]). A "reasonable accommodation" for an employee's impairment is one which "permit[s] an employee with a disability to perform in a reasonable manner activities involved in the job" and does not impose an "undue hardship" on the employer's business

(Executive Law § 292 [21-e]). [11]  ADA defines the term "discriminate" to include not making

reasonable accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability who is an applicant or employee, unless such covered entity can demonstrate

that the accommodation would impose an undue hardship on the operation of the business of such

covered entity 42 U.S.C. § 12112(b)(5)(A).  This language reveals that a person must meet the threshold

test of being a "qualified individual with a disability" in order to invoke the ADA. The ADA defines a

"qualified individual with a disability" as an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual

holds or desires. 42 U.S.C. § 12111(8)[12].  To prevail on a claim under the ADA for failure to

accommodate, a plaintiff must make an initial showing "'that [she] was an individual who had a

disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that

with reasonable accommodation [she] could perform the essential functions of the position . . . ; and (4)

that the [employer] refused to make such accommodations.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11

(4th Cir. 2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). And,

as a necessary corollary of the fourth requirement, the plaintiff must have communicated to her

employer "a wish for accommodation of her disability." *Parkinson v. Anne Arundel Medical Center*, 79

Fed. App'x 602, 604 (4th Cir. 2003).[13]   In the case at bar, Plaintiff was found on September 24, 2001

by Commissioner Lauren A. Spekas to have a permanent partial disability resulting in 40% loss of use of

right foot; 35% is due to this accidental injury and 5% is due to a pre-existing condition; and further has

---

[11] Jacobsen v. N.Y.C. Health & Hosp. Corp., 2014 NY Slip Op 2098 (N.Y. 2014)
[12] Smith v. Midland Brake, Inc. , 180 F.3d 1154, 9 Am. Disabilities Cas. (BNA) 738, 1999 Colo. J. C.A.R. 3824 (Fed. 10th Cir., 1999)
[13] Adams v. Wells Fargo Advisors, LLC (D. Md., 2014)

an overall 15% industrial disability to the body due to psychiatric condition, 5% is due to this accidental injury, and 10% is due to a pre-existing condition as a result of her 1998 accident.[14]   On September 14, 2000, Plaintiff notified Defendant that she was disabled and that with a reasonable accommodation she could perform the essential elements of her job.[15]   For almost thirteen years starting from September 27, 2000 an ending on March 5 2013, Defendant was able to accommodate Plaintiff's reasonable accommodations request to use the Eager Street entrance without experiencing any undue hardship or great financial cost.  It was not until Plaintiff was disciplined for a minor policy violation that her reasonable accommodation was restricted.  ("In the employment context, once the plaintiff has established the existence of a reasonable accommodation that would enable him or her to perform the essential functions of an available job, the burden switches to the defendant to show that this accommodation would constitute an undue hardship.'")  *Smith v. Midland Brake, Inc. ,* 180 F.3d 1154, 9 Am. Disabilities Cas. (BNA) 738, 1999 Colo. J. C.A.R. 3824 (Fed. 10th Cir., 1999) (quoting *Barnett v. U.S. Air,Inc.*, [180 F.3d 1163] 157 F.3d 744, 749 (9th Cir. 1998)); *Barnett*, 157 F.3d at 749-50.*Smith. id.*

The definition of undue hardship is more explicit.  The regulations state that the following factors are to be considered in determining whether a particular accommodation would cause an undue hardship:

> (1) The overall size of the [employer]'s program with respect to number of employees, number and type of facilities, and size of budget;
> (2) The type of the [employer]'s operation, including the composition and structure of the recipient's workforce; and
> (3) The nature and cost of the accommodation needed.[16]

---

[14] 9/24/01 Workers Compensation Order
[15] 9/14/00 Letter for Dr. Mark Young
[16] 34 C.F.R. Sec. 104.12(c);  45 C.F.R. Sec. 84.12(c).

In this case, the Plaintiff argues that the accommodation requested is presumptively "reasonable" in light of the fact that the Defendant have relied upon the "reasonableness" of the request for a period of thirteen years in meeting their obligation to provide such an accommodation to the Plaintiff. To now argue that such an accommodation that has been provided for such a length of time has now become unreasonable, without providing any factual basis is almost farcical.  Defendant, in bringing this motion does not rely upon any change in Plaintiff's medical condition no longer making the Plaintiff unqualified with the present accommodation nor does it rely upon a change in Plaintiff's specific request now asking for something far more costly. Rather, Defendant merely proffers hypothetical situations that might occur should the accommodation continue. Obviously, if that is the basis for this motion, it is clearly and unquestionably premature as the accommodation that had been provided for thirteen years is still reasonable and still allows Plaintiff to remain a qualified individual who can perform the essential functions of the position.

In the present case, it is clear that the Plaintiff has met the burden of proving that she is a qualified person, and given reasonable accommodations she is able to conduct the essential elements of her job.  This is evident by the fact Plaintiff performed her job with a reasonable accommodations for over thirteen   years, thus the burden of proof switches to the Defendant to prove undue hardship.   In this case the Defendant is unable to satisfy the heighten burden.  First, Defendant agreed to Plaintiff's request for reasonable accommodations for thirteen years, without once arguing that doing so constituted an undue hardship.  When the reasonable accommodations were requested in 2000, Defendant had ample opportunity to raise an undue hardship and burden defense, however no such argument was made. In Defendant's Motion,  Defendant sets forth several hypothetical situations that could happen should

Plaintiff's reasonable accommodations continue, however, Defendant fails to acknowledge that the reasonable accommodation was in effect for thirteen years without any of the nightmarish scenarios coming to fruition.  Defendant has proffered no expert witnesses, occupational therapists, or medical personnel to dispute Plaintiff's request for reasonable accommodations, nor to support Defendant's claim that the reasonable accommodations requested by Plaintiff's physician is no longer medically necessary.  Defendant has argued that the alternative entrance is better for Plaintiff because it has access to an elevator -- Defendant fails to acknowledge the psychological trauma imposed on Plaintiff by being forced to use the very elevator that injured Plaintiff.  Has Defendant somehow forgotten that Plaintiff's right foot was mangled in and elevator accident forever causing her present handicap. If Defendant's intention in now claiming the present accommodation is no longer reasonable is punitive in nature, one could hardly think of a more macabre, inappropriate and mentally painful accommodation for someone who still must have nightmares and flashbacks of that horrific accident. There is no provision in the ADA that allows and employer to revoke a reasonable accommodation as a disciplinary tool.

Defendant also fails to correctly state the opinion of Michael S. Romeo, the Operations Manager for MVA Mobility service who after being requested, sent an MVA Mobility Supervisor to survey the new drop off location, came to the conclusion that "…parking lot is inaccessible to (our) Operators and is not a safe drop off point for a Mobility Vehicle.[17]  To this day, Plaintiff requires crutches to ambulate following the 1998 elevator incident.  The alternate entrance that Plaintiff is required to use following the revocation of her reasonable accommodations requires Plaintiff to walk a much further distance, thus putting unnecessary pressure on her injured foot.  Defendant's denial of access to the Eager Street

---

[17] June 26 letter to Stacey Lyles from Michael Romeo

entrance thereby causes increased pain to Plaintiff and makes her job difficult to complete.  It also

disrupts her ability to use MVA Mobility, which she depends on to transport her to and from work.

IV.     **PLAINTIFF TO BE SUBJECTED TO SEVERE AND PERVASIVE
MISTREATMENT AND DISCRIMINATION BY DEFENDANT THEREBY
CREATING A HOSTILE WORK ENVIRONMENT**

To establish a claim of a hostile work environment, an employee must prove that "the workplace

is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment." *Harris*

*v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993).   The facts set forth in the case at bar

indicate that since returning to work in September of 2001, Plaintiff has been subjected to intimidation,

ridicule, insult, physical and emotional abuse at the hands of her co-workers and employers.  Some

examples of these actions levied against Plaintiff are:

A.  Plaintiff was removed from the workstation which was originally provided to her as a

reasonable accommodations request.  She was told she needed a doctor's note to continue to

use the work station that was granted as part of her reasonable accommodations request.

When Plaintiff produce the requested doctor's note, Plaintiff's supervisor at the time

Lavonne Wells, tore up the requested doctor's note in Plaintiff's face.

B.  Plaintiff's harassment is continuous and ongoing.  Plaintiff has filed grievances with her

Union and charges at the U.S. Equal Employment Opportunity Commission and the

Maryland Commission on Civil Rights alleging that the discrimination and retaliation are

severe and pervasive thus creating a hostile work environment.

C. As a result of Plaintiff 's complaints about the discriminatory and hostile work environment, Defendant retaliated by removing the printer from Plaintiff's work booth causing Plaintiff to walk a greater distance in more pain.  When other co-workers horrified by the unjust nature of the punishment offer to assist Plaintiff, management promptly instructed co-workers not to assist Plaintiff in retrieving documents from the printer.

D. Plaintiff has been repeatedly denied access to a locker, even as other co-workers with less tenure are given lockers.

E. A co-worker pulled Plaintiff's chair from under her in a public common area that was witnessed by several people.  As Plaintiff was laying on the floor injured, other co-workers laughed and ridiculed her.  No employee was ever punished for injuring Plaintiff.

F. Plaintiff was ridiculed by other workers on a daily basis, some examples are being called a "beached whale,"  "a lame horse who needs to be taken out and shot," "a crip," "smelly," and "pissy". Despite Plaintiff's complaints, Defendant took no action to prevent such offensive conduct.

G. Defendant on numerous occasions tried to force Plaintiff to use the elevator that injured Plaintiff in an effort to force Plaintiff to "confront her fears".  Defendant has no expertise in mental health and occupational therapy; as such the tactics employed by Defendant were embarrassing and demoralizing to Plaintiff.

H. Plaintiff was isolated from the rest of her co-workers and placed in separate work area for an extended period of time.

These are merely examples of the conduct Plaintiff alleges were so severe and pervasive as to create a hostile work environment.  Further, despite Plaintiff's repeated complaints, Defendant has failed

to any action to prevent a hostile work environment by enforcing rules to prevent such discriminatory acts. Plaintiff filed the present action not as a measure of first resort but as a last.  Not only has Defendant condoned these discriminatory acts it has retaliated against Plaintiff for the filing of complaints with the appropriate enforcement agencies. As such, Plaintiff having exhausted all other avenues, now comes before this Court seeking its intervention.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss/Motion for Summary Judgment.

Respectfully submitted,

_____
John M. Singleton, Esq. Bar No. 02275
Darryl Armstrong, Esq.
The Singleton Law Group
1447 York Road, Suite 508
Lutherville, Maryland 21093
410 902-0073
410 902-7372 (fax)
jsingleton@singleton-law.com